**LITTON INDUSTRIES, INC., Plaintiff,**

v.

**LEHMAN BROTHERS KUHN LOEB INCORPORATED, Dennis Levine, Ira B. Sokolow, Robert M. Wilkis, Bank Leu International, Ltd., Bank Leu A.G., Bernhard Meier, John R. Lademann, Bruno Pletscher, Jean–Pierre Fraysse, and Christian Schlatter, Defendants.**

No. 86 Civ. 6447 (JMC).

United States District Court,
S.D. New York.

April 18, 1990.

Dilworth, Paxson, Kalish & Kauffman, Washington, D.C. by Michael I. Smith, Lawrence D. Berger, Scott R. Shepherd and M. Miller Baker, for plaintiff Litton Industries, Inc.

Fried, Frank, Harris, Shriver & Jacobsen, Washington, D.C. by Henry A. Hubschman, David M. Miles and David B. Hardison, for defendants Bank Leu Intern., Ltd., Bank Leu A.G., John R. Lademann, Bruno Pletscher and Christian Schlatter.

Weisberg & Berns, New York City by David E. Weisberg, for defendant Jean–Pierre Fraysse.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Martin Flumenbaum and Brad S. Karp, for defendant Dennis Levine.

Willkie, Farr & Gallagher, New York City by Anthony F. Phillips, Jeanne M. Luboja, Jonathan P. Wolfert and Laura A. Proske, for defendant Lehman Brothers Kuhn Loeb Inc.

## MEMORANDUM AND ORDER

CANNELLA, District Judge:

Defendants' motion for partial summary judgment is granted in part and denied in part. Fed.R.Civ.P. 56. Plaintiff's motion for leave to file a third amended complaint is granted. Fed.R.Civ.P. 15(a). Plaintiff's motion for reversal or modification of Magistrate Gershon's denial of its motion to compel the deposition testimony of Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1982). Plaintiff's motion to set aside Magistrate Gershon's ruling granting defendants' motion to strike plaintiff's reservation of right to supplement its Rule 26(b)(4) statement is denied. 28 U.S.C. § 636(b)(1)(A) (1982).

## BACKGROUND

This action has been before the Court on prior motions and, therefore, complete familiarity with the underlying facts is assumed. Only those facts relevant to the instant motions will be set forth below.

In November 1982, plaintiff, Litton Industries, Inc. ["Litton"], retained defendant Lehman Brothers Kuhn Loeb, Inc. (now known as Shearson Lehman Brothers) ["Lehman Brothers"] to provide services in connection with Litton's tender offer acquisition for all the outstanding securities of Itek Corporation ["Itek"]. Defendant Dennis Levine, an employee in Lehman Brothers' mergers and acquisitions department, allegedly learned of Litton's proposed tender offer from defendant Ira B. Sokolow, another employee of Lehman Brothers. In its second amended complaint [the "Complaint"], Litton alleges that Levine purchased 50,000 shares of Itek in advance of the public disclosure of Litton's tender offer through defendant Bank Leu International Limited (now known as Leu Trust and Banking (Bahamas) Limited) ["BLI"]. The Complaint further alleges that another 10,000 shares were purchased in open market transactions by defendants Jean–Pierre Fraysse (BLI's managing director), Bernhard Meier and Christian Schlatter (BLI employees), and BLI itself. Other defendants who allegedly assisted Levine in his massive trading based on nonpublic information include Bank Leu, A.G. ["BLZ"], John R. Lademann (BLI board member), Bruno Pletscher (BLI general manager), and Robert Wilkis (investment banker with Lazard Freres & Company). The gravamen of Litton's Complaint is that these illegal insider purchasers artificially inflated the market price of Itek stock, causing Litton to pay more than it otherwise would have had to pay in both its open market purchases of Itek stock and in its tender offer for the outstanding Itek securities.

Prior to the commencement of this action, certain defendants disgorged all or part of their profits from trading in Itek securities to the Securities and Exchange Commission [the "SEC"]. Pursuant to paragraph eight of an agreement between defendant BLI and the SEC executed on March 19, 1986, BLI agreed to disgorge on behalf of itself and its employees (other than Meier) all profits realized from the purchase and sale of Itek securities. BLI disgorged a total of $53,747.07 to the SEC as profit realized by BLI and two of its employees (Schlatter and Fraysse) from transactions in Itek securities through accounts maintained at BLI. This disgorgement represents BLI's profit of $14,879.15, Schlatter's profit of $24,038.77, and Fraysse's profit of $14,829.15. *See* Declaration of Henry A. Hubschman in Support *of Motion for Partial Summary Judgment,* at ¶¶ 3–5, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 26, 1989) ["Hubschman Declaration"]. The other remaining moving defendants—BLZ, Lademann, and Pletscher—did not trade in Itek securities and, therefore, did not disgorge any profits to the SEC.[1]

Levine realized a profit of $12,651,753.99 from the purchase and sale of securities, including a profit of $805,035.00 from the purchase and sale of 50,000 shares of Itek securities transacted through an account maintained on his behalf at BLI. *See* Hubschman Declaration, at ¶¶ 6, 8. In connection with a prior insider trading action filed against Levine by the SEC, Levine executed a Consent and Undertaking on June 4, 1986, whereby he agreed to the entry of a "Final Judgment of Permanent Injunction and Other Equitable Relief." *See SEC v. Levine,* 881 F.2d 1165, 1169 (2d Cir.1989). Pursuant to the Consent and Undertaking, Levine disgorged assets valued at $11.5 million to a receiver for satisfaction of any claims against Levine " 'arising out of the purchase and sale of securities by [Levine and his companies] as alleged in the Complaint' " filed by the SEC. *Id.* (quoting Consent and Undertaking, at ¶ 8 (July 4, 1986)). The SEC complaint included transactions in securities of Itek.

Among the various types of relief sought in the instant action, Litton seeks disgorgement of all profit, fees, and commissions earned from the sale and purchase of Itek securities by defendants Levine, Sokolow, Wilkis, Fraysse, Schlatter, Meier, BLI, and any third party acting on information supplied by any of the defendants. *See* Complaint, Relief ¶ 2.

There are four motions presently before the Court. First, defendants BLZ, BLI, Lademann, Pletscher, Schlatter, Fraysse, and Levine [collectively the "Bank Leu defendants"] seek partial summary judgment on Litton's claim for disgorgement of all profit, fees, and commissions earned on the purchase and sale of Itek securities. Second, Litton moves for leave to file a third amended complaint. Third, Litton moves for reversal or modification of Magistrate Gershon's denial of its motion to compel the deposition testimony of Levine. Lastly, Litton moves to set aside Magistrate Gershon's ruling granting defendants' motion to strike plaintiff's reservation of right to supplement its Rule 26(b)(4) statement.

## DISCUSSION

### I. *Summary Judgment*

#### A. *Disgorgement of Profits*

The Bank Leu defendants seek partial summary judgment on Litton's claim for disgorgement of all profits earned from the sale and purchase of Itek securities on the ground that such profits previously have been disgorged to the SEC.[2] Litton contends that disgorgement is an appropriate measure of damages in a private action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1982) [the "1934 Act"] and Rule 10b–5

---

1. Meier has not disgorged the $21,761.94 in profits from the sale and purchase of Itek securities through an account maintained at BLI. However, Meier has not moved for partial summary judgment.

2. The well established standards for the application of summary judgment have been previously set forth by this Court in its prior opinion granting defendants' motion for partial summary judgment. *See* 709 F.Supp. 438, 442–43 (S.D.N.Y.1989).

promulgated thereunder despite any prior disgorgement to the SEC. Alternatively, Litton argues that the Bank Leu defendants did not disgorge the full extent of their profits to the SEC, thereby preserving the availability of disgorgement as a measure of damages in this action.

■ The traditional measure of damages for a violation of Section 10(b) and Rule 10b–5 is the out-of-pocket rule as developed in the tort action of deceit. *See, e.g., Huddleston v. Herman & MacLean*, 640 F.2d 534, 555 (5th Cir.1981), *aff'd in part, rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Blackie v. Barrack*, 524 F.2d 891, 909 (9th Cir.1975), *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Levine v. Seilson, Inc.*, 439 F. 2d 328, 334 (2d Cir. 1971). With respect to defrauded sellers under Rule 10b–5, the Supreme Court has recognized that the proper measure of out-of-pocket loss is the difference between the value of what the seller received and the value of what the seller would have received had there been no fraudulent conduct. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972); *see also Alley v. Miramon*, 614 F.2d 1372, 1387 (5th Cir. 1980) ("As a general rule, the correct measure of a seller's damages in a 10b–5 action is the difference between the price received and the value of the securities at the time of the fraudulent transaction."). However, the Supreme Court recognized one major exception to this customary measure of damages. Where the defrauding purchaser receives more than the seller's actual loss, the proper measure of damages shall be the amount of the purchaser's profits. *Affiliated Ute Citizens*, 406 U.S. at 155, 92 S.Ct. at 1473.

The origin of the disgorgement measure of damages for defrauded sellers of securities endorsed by the Supreme Court in *Affiliated Ute Citizens* is *Janigan v. Taylor*, 344 F.2d 781 (1st Cir.), *cert. denied*, 382 U.S. 879, 86 S.Ct. 163, 15 L.Ed.2d 120 (1965). In *Janigan*, the First Circuit recognized that the profit made by a purchaser who acquired property by fraud should be deemed the proximate consequence of the fraud since the profit would not have accrued absent the fraudulently induced sale. 344 F.2d at 786. Although the *Janigan* disgorgement measure of damages has been applied primarily in the context of a defrauded seller, the Second Circuit has expressly rejected any such limitation. *See Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 802 (2d Cir.1973). Other circuits have similarly recognized that disgorgement principles apply equally to an innocent party induced to purchase securities. *See, e.g., Pidcock v. Sunnyland America, Inc.*, 854 F.2d 443, 447 n. 7 (11th Cir.1988); *Hackbart v. Holmes*, 675 F.2d 1114, 1122 (10th Cir.1982); *Ohio Drill & Tool Co. v. Johnson*, 498 F.2d 186, 191 (6th Cir.1974); *Occidental Life Ins. Co. v. Pat Ryan & Assocs., Inc.*, 496 F.2d 1255, 1265 (4th Cir.), *cert. denied*, 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974).

In the instant action, plaintiff seeks a damage award from the Bank Leu defendants measured by the value of their illegal profits. While disgorgement is clearly permitted as a proper measure of damages in a 10b–5 action, it is essential to bear in mind that disgorgement is a mechanism by which the equitable remedy of restitution is effectuated. *See Tull v. United States*, 481 U.S. 412, 424, 107 S.Ct. 1831, 1839, 95 L.Ed.2d 365 (1987); 5 J. Moore, J. Lucas & J. Wicker, *Moore's Federal Practice* ¶ 38.24[2], at 38–206 (2d ed. 1988). In fact, the *Janigan* court—which pioneered the disgorgement measure of damages—concluded that disgorgement is a proper alternative measure of damages because "it is simple equity that a wrongdoer should disgorge his fraudulent enrichment." *Janigan*, 344 F.2d at 786. The Supreme Court has recently recognized that the disgorgement measure of damages in a 10b–5 action is a remedy designed to prevent unjust enrichment.

> This alternative standard aims at preventing the unjust enrichment of a fraudulent buyer, and it clearly does more than simply make the plaintiff whole for the economic loss proximately caused by the buyer's fraud. Indeed, the accepted rationale underlying this alternative is

simply that "[i]t is more appropriate to give the defrauded party the benefit even of windfalls than to let the fraudulent party keep them."

*Randall v. Loftsgaarden,* 478 U.S. 647, 663, 106 S.Ct. 3143, 3152, 92 L.Ed.2d 525 (1986) (quoting *Janigan,* 344 F.2d at 786).

■ It is clear that the underlying purpose of allowing disgorgement as an exception to the traditional out-of-pocket measure of damages is to prevent unjust enrichment. Thus, the Court finds that once ill-gotten gains have been disgorged to the SEC, there remains no unjust enrichment and, therefore, no basis for further disgorgement in a private action. Any other result would conflict with the well settled principle in the Second Circuit that a private party may not recover punitive damages for a violation of Section 10(b) and Rule 10b–5. *See, e.g., Manufacturers Hanover Trust Co. v. Drysdale Sec. Corp.,* 801 F.2d 13, 29 (2d Cir.1986), *cert. denied sub nom., Arthur Anderson & Co. v. Manufacturers Hanover Trust Co.,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987); *Globus v. Law Research Serv., Inc.,* 418 F.2d 1276, 1283 (2d Cir.1969), *cert. denied,* 397 U.S. 913, 90 S.Ct. 913, 25 L.Ed.2d 93 (1970); *Green v. Wolf Corp.,* 406 F.2d 291, 302–03 (2d Cir.1968), *cert. denied,* 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969). Once ill-gotten profits have been disgorged to the SEC, further disgorgement as damages in a private action is clearly punitive in its effect and would constitute an impermissible penalty assessment.

Decisional law touching on related issues supports this limitation on the availability of the disgorgement measure of damages in a private action under Section 10(b) and Rule 10b–5. For example, in *National Westminster Bancorp NJ v. Leone,* 702 F.Supp. 1132 (D.N.J.1988), the court considered whether a corporation could recover its statutory remedy under Section 16(b) of the 1934 Act for disgorgement of profits realized in short-swing trading by insiders when the SEC had already settled a separate suit for disgorgement under Rule 10b–5. Plaintiff asserted that the profits disgorged to the SEC in the 10b–5 action were substantially lower than the proper calculation of profits under Section 16(b). *Id.* at 1134. Defendants, on the other hand, argued that no profits remained to be disgorged since it paid all profits to the SEC pursuant to its settlement. *Id.* at 1135. The court held that "plaintiff may not recover from defendants any profits already disgorged to SEC in the prior action, but plaintiff may attempt to prove the insufficiency of the SEC settlement and recover any difference between actual profits and the amount disgorged to the SEC." *Id.* at 1140. The Court finds no meaningful legal distinction between *Leone,* which involved a private action under Section 16(b), and the instant action, which involves a private action under Section 10(b). Under both sections, disgorgement is a proper measure of damages which serves the equitable purpose of depriving a wrongdoer of ill-gotten gains. Moreover, Section 10(b), like Section 16(b), is a remedial provision. *See Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 608–09, 93 S.Ct. 1736, 1751–52, 36 L.Ed.2d 503 (1973); *Gund v. First Florida Banks, Inc.,* 726 F.2d 682, 686 (11th Cir.1984).

In *SEC v. Penn Cent. Co.,* 425 F.Supp. 593 (E.D.Pa.1976), the SEC brought an action under Section 10(b) for disgorgement of defendants' profits. Prior to the SEC action, however, defendants had settled several private suits against them based on the same allegations as those made by the SEC. The court upheld the SEC's ability to seek disgorgement from the defendants. However, the court noted that "[t]o the extent that defendants have made restitution, the amounts paid would serve to offset part or all of a judgment for disgorgement." *Id.* at 599. Although the SEC and private defrauded investors have different roles,[3] restitutionary awards to private

---

**3.** In its enforcement role, the SEC appears "not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws." *SEC v.* *Management Dynamics, Inc.,* 515 F.2d 801, 808 (2d Cir.1975). The SEC generally seeks disgorgement of profits to "force 'a defendant to give up the amount by which he was unjustly

plaintiffs should also be reduced by the extent of any prior disgorgement to the SEC. In each instance, disgorgement aims to prevent unjust enrichment. *See SEC v. Commonwealth Chemical Sec., Inc.*, 574 F.2d 90, 102 (2d Cir.1978) ("[T]he primary purpose of disgorgement [to the SEC] is not to compensate investors. Unlike damages, it is a method of forcing a defendant to give up the amount by which he was unjustly enriched.").

### B. Disgorgement of Fees and Commissions

■ In addition to disgorgement of profits, Litton seeks disgorgement of all fees and commissions received from the purchase and sale of Itek securities. Defendant BLI earned $42,181.29 in fees and commissions from the purchase and sale of Itek securities on behalf of itself, Schlatter, Fraysse, Levine, and nonmoving defendant Meier. Hubschman Declaration, at ¶ 10. Of this amount, however, BLI paid $16,294.02 in commissions to third-party brokers. *Id.* Thus, BLI did not retain all of the fees and commissions.

To require disgorgement of all fees and commissions without permitting a reduction for associate expenses and costs constitutes a penalty assessment and goes beyond the restitutionary purpose of the disgorgement doctrine. Therefore, transaction costs such as brokerage commissions incurred by BLI in executing trades in Itek securities should be deducted from any fees and commissions disgorged as profit.

enriched' rather than to compensate the victims of fraud." *SEC v. Blavin,* 760 F.2d 706, 713 (6th Cir.1985) (quoting *SEC v. Commonwealth Chemical Sec., Inc.,* 574 F.2d 90, 102 (2d Cir. 1978)).

4. For example, it is unclear whether the $53,747.07 disgorged by defendants BLI, Schlatter, and Fraysse represents the total amount of profit from transactions in Itek securities. Furthermore, as to defendant Levine, the record indicates that he disgorged $11.5 million, representing 90.9% of the $12,651,753.99 of total profit realized by Levine from transactions in a variety of securities. However, the Court cannot determine whether this disgorgement includes all or merely a portion of the $805,035.00 of profit realized by Levine from transactions in Itek securities.

*Cf. Herrmann v. Steinberg,* 812 F.2d 63, 66 (2d Cir.1987) (incidental transaction expenses incurred in purchasing stock are deductible from defendant's disgorgement of short-swing profits under Section 16(b)); *Oliff v. Exchange Int'l Corp.,* 669 F.2d 1162, 1168 (7th Cir.1980), *cert. denied,* 450 U.S. 915, 101 S.Ct. 1358, 67 L.Ed.2d 340 (1981) (direct transaction expenses such as brokerage commissions are deductible from defendant's disgorgement of short-swing profits under Section 16(b)).

Accordingly, the Bank Leu defendants' motion for partial summary judgment is granted in part and denied in part. Fed.R. Civ.P. 56. The motion is granted to the extent that the Court finds as a matter of law that Litton may not recover from the Bank Leu defendants any profits already disgorged to the SEC in the prior action. The motion is denied to the extent that a genuine issue of material fact exists as to whether the amounts previously disgorged to the SEC constitute all illegal profits realized by the Bank Leu defendants.[4] If Litton establishes at trial that the Bank Leu defendants did not disgorge the full extent of their illegal profits, the proper measure of disgorgement damages shall be the difference between each defendant's actual profit and the amount disgorged to the SEC. On the other hand, if the evidence shows that the Bank Leu defendants disgorged all of their profits to the SEC, the traditional out-of-pocket measure of damages shall be the extent of any recovery.[5]

5. Litton argues that the Bank Leu defendants are jointly and severally liable for disgorgement of all profits earned on Itek securities. However, unlike Litton's prayer of relief for actual and consequential damages, the Court finds that the disgorgement prayer fails to expressly allege joint and several liability. Rather, Litton's disgorgement prayer of relief only seeks to recover from each trading defendant the amount of profits which that defendant realized on transactions in Itek securities. However, even if Litton's disgorgement prayer of relief was based on joint and several liability, it is unclear whether such recovery is permitted as a matter of law given the restitutionary nature of a disgorgement award. *See Nelson v. Serwold,* 687 F.2d 278, 281 (9th Cir.1982) (Defendant "should not be made to disgorge the profit from the sale of the stock owned by other members of the con-

## II. *Motion to Amend*

Litton seeks leave to file a third amended complaint in this action, principally to include a claim of punitive damages in the existing counts charging Lehman Brothers with negligence and breach of fiduciary duty. Additionally, the proposed third amended complaint removes three counts (old counts two, twelve, and thirteen) previously dismissed by this Court in a prior decision. *See* 709 F.Supp. 438 (S.D.N.Y. 1989).

▆▆▆ Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). As a matter of law, justice requires leave to amend when the moving party has "at least colorable grounds" for the proposed amendment. *S.S. Silberblatt, Inc. v. East Harlem Pilot Block—Building 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir. 1979). The Supreme Court has recognized that this freedom of amendment is limited when there is undue prejudice to the opposing party. *See Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330–31, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Alternatively, a motion to amend must be denied if there is "undue delay, bad faith or dilatory motive" on the part of the moving party. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230. Mere delay, however, is an insufficient basis to deny a motion to amend absent a concomitant showing of undue prejudice or bad faith. *See Madison Fund, Inc. v. Denison Mines Ltd.*, 90 F.R.D. 89, 92 (S.D.N.Y.1981); *International Bank v. Price Waterhouse & Co.*, 85 F.R.D. 140, 142 (S.D.N.Y.1980). Of course, the grant or denial of leave to amend is ultimately within the sound judicial discretion of the district court. *Foman*, 371 U.S. at 182, 83 S.Ct. at 230.

▆▆▆ It is clear that the proposed third amended complaint contains no new factual allegations. Thus, this is not a situation where the proposed amendment alleges an entirely new set of operative facts. On the contrary, the proposed amended complaint merely adds a punitive damages claim against Lehman Brothers. Nevertheless, courts have consistently denied leave to amend to add a claim of punitive damages where the motion was filed after the close of discovery and would necessitate extensive discovery directed toward the willfulness of defendant's conduct. *See, e.g., Knapp v. Whitaker*, 757 F.2d 827, 849 (7th Cir.), *cert. denied, appeal dismissed,* 474 U.S. 803, 106 S.Ct. 36, 88 L.Ed.2d 29 (1985); *Leroy v. Hartford Steam Boiler Inspection & Ins. Co.*, 695 F.Supp. 1120, 1133 (D.Kan.1988); *Buhl v. Biosearch Medical Prods., Inc.*, 635 F.Supp. 956, 959 (D.Mont. 1985).

Litton's proposed amendment comes over three years after it filed its original complaint. While this delay cuts against a grant of the amendment, it certainly is not dispositive. It appears that the amendment is based on facts developed during discovery, including the deposition of persons associated with Lehman Brothers during the period in question. The resulting prejudice to Lehman Brothers, if any, is extremely minimal and does not rise to the level of "undue prejudice." Although pretrial preparation has been extensive, discovery is still open and there is no set trial date. Therefore, the parties are not burdened by the reopening of discovery. Moreover, it does not appear that the proposed amended complaint will result in extensive additional discovery or unduly delay the trial. Any resulting prejudice is further minimized by the fact that Magistrate Gershon stayed discovery of all Lehman Brothers witnesses pending resolution of Litton's motion to amend. *See* Hearing Transcript, at 64–65, 86 Civ. 6447 (JMC) (S.D.N.Y. Sept. 5, 1989).

---

trol group because [he] did not benefit from that profit."); *Quintel Corp., N.V. v. Citibank, N.A.,* 596 F.Supp. 797, 804 (S.D.N.Y.1984) ("Although joint tort feasors [sic] are jointly liable for actual damages, it is not appropriate to impose windfall damages, the purpose of which is designed to prevent unjust enrichment, on a defendant who did not receive the windfall profits.").

Accordingly, Litton's motion for leave to file a third amended complaint is granted. Fed.R.Civ.P. 15(a).

### III. *Motion to Compel the Deposition of Dennis Levine*

At his deposition on July 30, 1987, Levine declined to answer approximately 420 of the over 500 questions asked by Litton by invoking the fifth amendment privilege against self-incrimination. Litton moved to compel Levine to answer approximately seventy-five questions which it felt did not elicit answers incriminatory to Levine. In particular, Litton moved to compel the deposition testimony of Levine with respect to four categories of questions: (1) Levine's employment history at Lehman Brothers and Drexel Burnham Lambert; (2) Levine's testimony before the United States House of Representatives' Subcommittee on Oversight and Investigations; (3) the criminal charges to which Levine pled guilty; and (4) the nature of Levine's assets.

### A. *The Decision Below*

Magistrate Gershon denied Litton's motion to compel the deposition testimony of Levine with respect to each question at issue. Based in part on limitations in Levine's prior plea agreement with the United States Attorney's Office for the Southern District of New York,[6] Magistrate Gershon found Levine's fear of criminal prosecution to be real and substantial.

> The limitations of Levine's plea agreement and the remaining potential for criminal prosecution demonstrate that Levine's vulnerability to further prosecution is not imaginary or fanciful. He may still be prosecuted by the State of New York for evasion of state income taxes, and by New York or other states for violations of state securities fraud

laws. He may also be prosecuted by federal authorities from districts other than the Southern District of New York for offenses including federal securities fraud, mail fraud, and wire fraud.

*Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 122 F.R.D. 433, 434–35 (S.D.N.Y. 1988) (footnotes omitted) ["Magistrate's Order"]. Having concluded that Levine's fear of further prosecution cannot be deemed fanciful, Magistrate Gershon next considered whether Levine's responses to the questions at issue "could 'furnish a link in the chain' of evidence needed to prosecute him for such crimes." *Id.* at 435. Based on her examination of each question at issue, Magistrate Gershon held that Levine's responses could incriminate him by furnishing a link in the chain of evidence needed to prosecute him for a host of state and federal violations.

Litton now seeks reversal or modification of Magistrate Gershon's order. However, Litton has limited the scope of information it seeks to compel to only two categories of questions: (1) Levine's employment history at Lehman Brothers and (2) Levine's testimony before congress.

### B. *The Standard of Review*

Rule 72(a) of the Federal Rules of Civil Procedure and 28 U.S.C. § 636(b)(1)(A) guide the Court's review of Magistrate Gershon's findings. Under both the rule and the statute, the appropriate standard of review depends on whether the issue decided by the magistrate is dispositive or nondispositive. As to nondispositive matters, a district court shall reverse a magistrate's findings if they are "clearly erroneous or contrary to law." 28 U.S.C. § 636(b)(1)(A) (1982); Fed.R.Civ.P. 72(a). However, as to those matters deemed by

---

**6.** On June 4, 1986, Levine pled guilty to an information charging him with two counts of federal income tax evasion for the years 1983 and 1984, one count of federal securities fraud in connection with the purchase and sale of the stock of Jewel Companies, Inc., and one count of perjury for testifying falsely before the Securities and Exchange Commission as to an investment in Textron, Inc. As part of its exchange for Levine's guilty plea, the United States Attor-

ney's Office for the Southern District of New York agreed not to prosecute him for any matters arising out of his securities trading through BLI from 1980 to 1986. The agreement, however, provided that it "is limited to the United States Attorney's Office for the Southern District of New York, and cannot bind other federal, state or local prosecuting authorities with the exception of the Tax Division, Department of Justice."

congress to be dispositive, the court's review is governed by a de novo standard. 28 U.S.C. § 636(b)(1)(B) (1982); Fed.R. Civ.P. 72(b).

Litton's motion to compel the deposition testimony of Levine is nondispositive since it would not resolve the substantive claims for relief alleged in the pleadings. *See* Fed.R.Civ.P. 72(a). Therefore, a clearly erroneous standard governs the Court's review. *See United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 2411, 65 L.Ed.2d 424 (1980). The Supreme Court has recognized that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed. 746 (1948). This standard has been consistently applied to afford magistrates broad discretion in resolving discovery disputes. *See, e.g., Aries Ventures Ltd. v. Axa Finance S.A.,* 696 F.Supp. 965, 966 (S.D.N.Y.1988); *Environmental Tectonics Corp., Int'l v. W.S. Kirkpatrick & Co.,* 659 F.Supp. 1381, 1398–99 (D.N.J.1987), *aff'd in part, rev'd in part,* 847 F.2d 1052 (3d Cir.1988), *cert. granted,* — U.S. ——, 109 S.Ct. 3213, 106 L.Ed.2d 563 (1989); *Empire Volkswagen, Inc. v. World–Wide Volkswagen Corp.,* 95 F.R.D. 398, 399 (S.D.N.Y.1982), *aff'd,* 814 F.2d 90 (2d Cir.1987). Accordingly, Magistrate Gershon's decision is entitled to great deference and shall not be overturned unless it is clearly erroneous or contrary to law.

### C. *The Fifth Amendment Privilege*

■ The fifth amendment's guarantee against testimonial compulsion provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself...." U.S. Const. amend. V. The scope of the privilege is well established. The privilege "protects against any disclosures that the witness reasonably believes could be used in a criminal prosecution or could lead to other evidence that might be so used." *Kastigar v. United States,* 406 U.S. 441, 445, 92 S.Ct. 1653, 1656, 32 L.Ed.2d 212 (1972). Valid invocation of the privilege occurs if the witness' testimony would "furnish a link in the chain of evidence needed to prosecute the claimant" for a crime. *Hoffman v. United States,* 341 U.S. 479, 486, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951). The potential for self-incrimination, however, must be a real danger that is not merely imaginary or hypothetical. *United States v. Edgerton,* 734 F.2d 913, 921 (2d Cir.1984); *United States v. Rodriquez,* 706 F.2d 31, 37 (2d Cir.1983); *United States v. Melchor Moreno,* 536 F.2d 1042, 1049 (5th Cir.1976). The Second Circuit has made clear that as to each inquiry the court must look to whether the testimony in question provides evidence of a crime and not to the government's intention to prosecute. *Edgerton,* 734 F.2d at 921; *ACLI Int'l Commodity Servs., Inc. v. Banque Populaire Suisse,* 110 F.R.D. 278, 282 (S.D.N.Y.1986). However, the Supreme Court has cautioned that the witness should not be required to prove his claim of self-incrimination in a traditional sense.

> [I]f the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee. To sustain the privilege it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.

*Hoffman,* 341 U.S. at 486–87, 71 S.Ct. at 818.

■ Litton claims that the opinion below was clearly erroneous or contrary to law in numerous material respects. First, Litton contends that Levine's fifth amendment claims were not founded on a real and substantial hazard of incrimination. In support of its position, Litton notes the absence of any existing prosecution of Levine and Levine's failure to establish that any jurisdiction has interest in prosecuting him for purchases of Itek stock approxi-

mately six years ago. Although the lapse of time without official action cuts against the likelihood of future prosecution, *see In re Gilboe*, 699 F.2d 71, 76 (2d Cir.1983), it does not preclude valid assertion of the fifth amendment privilege. Based upon her examination of each question posed to Levine, Magistrate Gershon concluded that the risk of prosecution for a host of federal and state violations was indeed real and substantial. Magistrate's Order, at 4–5. No further inquiry was required. In fact, the Second Circuit has expressly rejected the notion that proper invocation of the privilege depends on the government's intention to prosecute. *Edgerton*, 734 F.2d at 921. Rather, " '[o]nce the court determines that the answers requested would tend to incriminate the witness, it should not attempt to speculate whether the witness will in fact be prosecuted.' " *Id.* (quoting *United States v. Jones*, 703 F.2d 473, 478 (10th Cir.1983)). Magistrate Gershon properly refrained from such speculation.

■ Second, Litton contends that Magistrate Gershon erred in failing to require Levine to explain the manner in which his answers would be incriminatory. "If the court determines that the incriminatory nature is not readily apparent, the witness then must endeavor to explain how his answer will be incriminatory." *Edgerton*, 734 F.2d at 919. While such a burden requires the witness to partially surrender the very protection which the privilege is designed to guarantee, it is nonetheless necessary to maintain a proper balance between a litigant's right to information and a witness' constitutional right to invoke the fifth amendment privilege. *See id.; In re Morganroth*, 718 F.2d 161, 170 (6th Cir. 1983). However, Magistrate Gershon found that the incriminatory nature of Levine's responses was readily apparent. The opinion below properly recognized that "[t]he limitations of Levine's plea agreement and the remaining potential for crimi-

nal prosecution demonstrate that Levine's vulnerability to further prosecution is not imaginary or fanciful." Magistrate's Order, at 4. This is clearly not a situation where "seemingly innocent questions exist in a setting presently devoid of incriminating overtones...." *In re Morganroth*, 718 F.2d at 170. Therefore, Magistrate Gershon's failure to require Levine to explain how his answer to each question would be incriminatory is not clearly erroneous or contrary to law.

■ Third, Litton contends that Magistrate Gershon considered only a few discrete questions and then grouped the remaining questions together, thereby failing to discuss whether each individual question was incriminatory. In considering whether to compel Levine to testify, the magistrate could not accept a "blanket assertion of the fifth amendment privilege" but was required to "undertake a particularized inquiry to determine whether the assertion was founded on a reasonable fear of prosecution as to each of the questions posed." *United States v. Zappola*, 646 F.2d 48, 53 (2d Cir.1981). The opinion below clearly met this standard. Specifically, Magistrate Gershon stated that "I have reviewed *each* of the questions at issue on this motion. The questions analyzed below are representative illustrations of the seventy-five questions Litton seeks to ask Levine." Magistrate's Order, at 6 (emphasis added). Thus, it is apparent that Magistrate Gershon did conduct a particularized inquiry into the legitimacy of the privilege with respect to each of the questions posed to Levine. The fact that the opinion below analyzes representative illustrations of these questions is not clearly erroneous or contrary to law.

■ The Court has considered Litton's remaining arguments and finds them to be without merit. Litton has failed to show that the magistrate's decision is in any respect clearly erroneous or contrary to law.[7]

---

7. In the event that Levine is not compelled to testify, Litton contends that as a matter of fundamental fairness Levine should be barred from offering into evidence any material relating to matters on which he asserted his fifth amendment privilege. It is self-evident that one of the essential purposes of discovery is to avoid unfair surprise at trial. However, given the exten-

Accordingly, Litton's motion to reverse or modify Magistrate Gershon's denial of its motion to compel the deposition testimony of Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1982).

## IV. *Motion to Strike Plaintiff's Reservation of Right to Supplement its Rule 26(b)(4) Statement*

On July 29, 1988, Magistrate Gershon established a schedule for the parties to designate all their respective experts and to provide responses to outstanding Rule 26(b)(4) interrogatories seeking the disclosure of opinions as to which such experts would testify [the "July 29 scheduling order"]. In particular, Magistrate Gershon directed Litton to provide complete damage expert designations by October 15, 1988 and to provide complete designations for any other experts by October 31, 1988. Hearing Transcript, at 29, 86 Civ. 6447 (JMC) (S.D.N.Y. July 29, 1988). In turn, defendants were directed to furnish complete expert designations by December 10, 1988. *Id.* Magistrate Gershon recognized that it is fair to allow each party to prepare its case independently and then simultaneously exchange expert designations only if defendants know the basis for plaintiff's claim. *Id.* at 30. However, as the magistrate found the exact nature of plaintiff's case to be unclear, she ruled that defendants should be permitted to know the exact basis for plaintiff's position before they designated their experts. *Id.*

Pursuant to Rule 26(b)(4) of the Federal Rules of Civil Procedure and the July 29 scheduling order, Litton designated in a timely manner the experts it expected to call at trial and provided summaries of their testimony, which have since been supplemented. In particular, on October 14, 1988, Litton designated Dr. Grossman as its only damages expert. On October 28, 1988, Litton subsequently designated Professor Posner as its only liability expert. In each designation, however, Litton included the following reservation of rights clause:

> Litton reserves the right to call at trial in its case-in-chief such other expert or experts as Litton may deem necessary to testify to the validity, correctness, acceptability and/or accuracy of the theories, methods, manner and calculations used and of the conclusions reached by the expert designated below. Litton further reserves the right to call at trial such expert or experts in rebuttal as Litton may deem necessary in light of actions taken, evidence offered or witnesses called by defendants or other matters occurring at trial.

Plaintiff's Designation of Rule 26(b)(4) Response Regarding Expert Witness on Damages Caused by Defendants, at 2, 86 Civ. 6447 (JMC) (S.D.N.Y. Oct. 14, 1988).

The Bank Leu defendants, joined by defendant Lehman Brothers, orally moved before Magistrate Gershon to strike Litton's reservation of rights. Litton opposed the motion on the ground that the precautionary language in the reservation of rights simply reflected the possibility that subsequent events may require additional expert designations.

Magistrate Gershon struck Litton's reservation of rights clause, finding that "[t]here is no point of expert designation if you can reserve rights when you want." Hearing Transcript, at 20, 86 Civ. 6447 (JMC) (S.D.N.Y. Nov. 9, 1988) ["Nov. 9 Hearing Transcript"]. However, the magistrate indicated that Litton may make an application to add a new expert based upon newly discovered evidence if something unexpected occurs. *See id.* at 33. Since the deadline established in the July 29 scheduling order had passed, Magistrate Gershon noted that Litton has the burden of establishing that any future expert designation could not have been done earlier. *See id.*

The Bank Leu defendants' motion to strike Litton's reservation of rights clause

---

sive amount of discovery that has taken place, it seems unlikely at this stage in the action that unfair surprise is imminent. Therefore, Litton's request is premature. *See Carter–Wallace, Inc. v. Hartz Mountain Indus., Inc.,* 553 F.Supp. 45, 50 (S.D.N.Y.1982). As Magistrate Gershon properly noted, the Court can take appropriate measures at trial to protect Litton if it appears that unfair surprise becomes a serious problem. *See* Magistrate's Order, at 13.

in its Rule 26(b)(4) statement is nondispositive and, therefore, a clearly erroneous or contrary to law standard governs the Court's review of the decision below. *See* 28 U.S.C. § 636(b)(1)(A) (1982); Fed.R. Civ.P. 72(a). Magistrate Gershon did not abuse her discretion when striking Litton's reservation of rights to name additional experts. On the contrary, Magistrate Gershon made it clear that her decision was based on the unique circumstances of the case.

> As I indicated, we have here both Rule 26(b)(4) and my order of [July 29] which was constructed based upon the particular facts and circumstances of this case. And what I concluded were the needs of the parties on this case. Not every case is the same. And here it was clear to me that before we could go forward, and before I could ask the defendants to identify their experts, the plaintiff had to say what this case was about and how it calculated damages.

Nov. 9 Hearing Transcript, at 31.

This is not a situation where Litton simply responded to an interrogatory early on in the litigation by incorporating a reservation of rights to name additional experts. As such, the issue is not merely the propriety of a reservation of rights clause in a Rule 26(b)(4) statement. Rather, the Rule 26(b)(4) statement must be viewed in light of Magistrate Gershon's July 29 scheduling order which reflected the individual needs of the parties by providing a carefully calculated schedule for the nonsimultaneous exchange of expert designations. Pursuant to the July 29 scheduling order, defendants are entitled to a timely good faith representation from Litton of all experts it intends to call at trial. Any reservation of rights by Litton in its Rule 26(b)(4) statement that would permit it to call additional experts in its case-in-chief or in rebuttal would impermissibly circumvent the July 29 scheduling order and would be subject to preclusion. While preclusion of expert testimony is an extreme sanction, *see Outley v. City of New York*, 837 F.2d 587, 591 (2d Cir.1988), failure to comply with a pretrial schedule for the parties to designate expert witnesses frequently results in the preclusion of the expert testimony. *See, e.g., Hull v. Eaton Corp.*, 825 F.2d 448, 452 (D.C.Cir.1987); *Rabb v. Amatex Corp.*, 769 F.2d 996, 1000 (4th Cir.1985); *Spray–Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1245–46 (7th Cir.1982), *aff'd on other grounds*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Therefore, the decision below was not clearly erroneous or contrary to law.

Accordingly, Litton's motion to set aside Magistrate Gershon's ruling granting the Bank Leu defendants' motion to strike Litton's reservation of right to supplement its Rule 26(b)(4) statement is denied. 28 U.S.C. § 636(b)(1)(A) (1982). The parties shall bear their own costs and attorneys' fees in connection with this motion.

## CONCLUSION

Defendants' motion for partial summary judgment is granted in part and denied in part. Fed.R.Civ.P. 56. Plaintiff's motion for leave to file a third amended complaint is granted. Fed.R.Civ.P. 15(a). Plaintiff's motion for reversal or modification of Magistrate Gershon's denial of its motion to compel the deposition testimony of Levine is denied. 28 U.S.C. § 636(b)(1)(A) (1982). Plaintiff's motion to set aside Magistrate Gershon's ruling granting defendants' motion to strike plaintiff's reservation of right to supplement its Rule 26(b)(4) statement is denied. 28 U.S.C. § 636(b)(1)(A) (1982).

Plaintiff shall file a third amended complaint in the proposed form submitted within ten (10) days of the filing of this Memorandum and Order. All defendants shall file an amended answer within ten (10) days of the filing of the amended complaint.

The parties are presently scheduled to appear at a discovery conference before Magistrate Gershon on April 26, 1990 at 11:00 a.m. At that time, Magistrate Gershon shall establish a final discovery cutoff date. All pretrial papers must be submitted within ten (10) days after the final discovery cutoff. Upon submission of pretrial papers, this action will be placed on the Court's Ready Calendar and may be

**1084**

called to trial on forty-eight (48) hours' notice.

SO ORDERED.