# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| WENDY LEE, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) | C.A. No. 8458-CB |
| | ) | |
| MARK PINCUS, JOHN SCHAPPERT, WILLIAM GORDON, REID HOFFMAN, JEFFREY KATZENBERG, STANLEY J. MERESMAN, SUNIL PAUL, OWEN VAN NATTA, MORGAN STANLEY & CO. LLC, GOLDMAN, SACHS & CO., AND ZYNGA INC., | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  August 22, 2014
Date Decided:  November 14, 2014

Elizabeth M. McGeever and J. Clayton Athey of PRICKETT, JONES & ELLIOT, P.A., Wilmington, Delaware; Ethan D. Wohl of WOHL & FRUCHTER LLP, New York, New York, *Attorneys for Plaintiff*.

Danielle Gibbs and Nicholas J. Rohrer of YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Jordan Eth, Anna Erickson White and Kevin A. Calia of MORRISON & FOERSTER LLP, San Francisco, California, *Attorneys for Defendants Mark Pincus, John Schappert, William Gordon, Reid Hoffman, Jeffrey Katzenberg, Stanley J. Meresman, Sunil Paul, Owen Van Natta, and Zynga Inc.*

Gregory V. Varallo, Thomas A. Uebler and Robert L. Burns of RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Bruce D. Angiolillo and Jonathan K. Youngwood of SIMPSON THACHER & BARTLETT LLP, New York, New  York; Simona G. Strauss of SIMPSON THACHER & BARTLETT LLP, Palo Alto, California, *Attorneys for Defendants Morgan Stanley & Co. LLC and Goldman, Sachs & Co.*

**BOUCHARD, C.**

## I. INTRODUCTION

This action involves allegations by a stockholder of Zynga Inc. ("Zynga") that, a few months after the company completed its initial public offering in December 2011, the board of directors waived in a discriminatory manner certain contractual restrictions that had prevented most pre-IPO investors from selling their stock for a designated period. Selectively waiving these "lockup" restrictions permitted some pre-IPO stockholders to sell a portion of their holdings almost two months before other pre-IPO stockholders, at what turned out to be a significantly higher price than was available later. Four of Zynga's eight directors received this opportunity. Plaintiff claims that Zynga's directors breached their fiduciary duty of loyalty by approving a self-dealing waiver of these lockups to the unfair benefit of half the members of the Zynga board (Count I). Plaintiff also claims that two investment banks, whose consent was necessary to waive the lockups, aided and abetted these breaches of fiduciary duty (Count II).

As discussed below, the specific waivers at issue were part of a larger decision by the Zynga board to restructure the lockup restrictions covering approximately 688 million shares of Zynga stock. This figure equates to almost seven times the number of shares (100 million shares) issued in the company's IPO. All of the lockups were set to expire on the same day: May 28, 2012. But, in March 2012, the Zynga board decided to stagger the lockup expirations, which would have the effect of gradually making more stock available to the public.

With their lockups modified, a group of pre-IPO stockholders were thereby able to participate in a secondary offering to the public that closed in early April 2012 at a price

1

of $12.00 per share. Each of the four Zynga directors who received lockup waivers sold millions of dollars of Zynga stock in this secondary offering. Zynga's founder, Chairman, and then-Chief Executive Officer, Mark Pincus, alone received over $192 million in proceeds. The two investment banks that consented to the lockup waivers together made over $10 million in fees by acting as underwriters for the secondary offering. Plaintiff's shares, in contrast to those of the four directors who participated in the secondary offering, remained locked up until May 29, 2012, when the closing price for Zynga's stock was $6.09 per share.

Zynga and the eight director defendants moved to dismiss Count I under (i) Court of Chancery Rule 23.1 for failure to make a pre-suit demand upon Zynga's board or to plead facts excusing such demand and (ii) Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief may be granted. The two underwriter defendants moved to dismiss Count II under Court of Chancery Rule 12(b)(6) for failure to state a claim.

In this opinion, I conclude that plaintiff has stated a claim for breach of fiduciary duty against the director defendants because it is reasonably conceivable that, when the members of the Zynga board restructured the lockup restrictions, half of the directors who approved that decision received an unfair benefit. I also conclude that plaintiff has not stated a claim for aiding and abetting because plaintiff has failed to plead facts from which it is reasonably inferable that the underwriters knowingly participated in a breach of fiduciary duty. Accordingly, the motion to dismiss Count I is denied, and the motion to dismiss Count II is granted.

2

## II.    BACKGROUND[1]

### A.    The Parties

Defendant Zynga, a Delaware corporation based in San Francisco, California, is in the "social gaming" industry.  Zynga produces interactive, online games (think FarmVille) that are accessible through facebook.com and other platforms.  It generates income primarily through advertising and selling so-called "virtual goods."  Its stock trades on the NASDAQ.  Zynga is named as a defendant "solely because it is a party to agreements underlying and relating to the [s]econdary [o]ffering."[2]

Between the company's IPO in December 2011 and the secondary offering in April 2012, Zynga's board consisted of eight individuals: defendants Mark Pincus ("Pincus"), John Schappert ("Schappert"), William Gordon, Reid Hoffman ("Hoffman"), Jeffrey Katzenberg, Stanley J. Meresman, Sunil Paul, and Owen Van Natta ("Van Natta").  All eight individuals had been directors of Zynga since November 2011.  Four of these directors received lockup waivers and then sold stock in the secondary offering: Pincus, Schappert, Hoffman, and Van Natta.  I refer to the eight individual defendants as the "Director Defendants," and to the Director Defendants and Zynga, collectively, as the "Zynga Defendants."

Defendant Pincus founded Zynga in 2007.  Through his ownership of high-voting stock, Pincus controlled 37.4% of Zynga's voting power immediately after the

---

[1] Unless noted otherwise, the facts recited in this opinion are based on the allegations of the Verified Amended Class Action Complaint (the "Amended Complaint").

[2] Am. Compl. ¶ 22.

3

company's IPO, and 36.5% immediately before the secondary offering. He sold 16.5 million shares in the secondary offering and received $192,060,000 in net proceeds, equating to $11.64 per share. Defendants Schappert, Hoffman, and Van Natta together sold approximately 1.5 million shares in the secondary offering, receiving over $17.6 million in net proceeds.

Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a Delaware limited liability company based in New York. Defendant Goldman, Sachs & Co. ("Goldman") is a New York limited partnership also based in New York. Morgan Stanley and Goldman (together, the "Underwriter Defendants") served as the lead underwriters, and as the representatives for the other underwriters, in Zynga's IPO and the secondary offering.

Plaintiff Wendy Lee ("Lee") has been a Zynga stockholder at all times relevant to this case. She was also a Zynga employee from 2009 until May 2011. On August 2, 2011, pursuant to a Stock Option Exercise Agreement (the "Exercise Agreement"), Lee acquired 30,000 shares of Zynga stock at an exercise price of $3.805 per share. In September 2012, she sold substantially all of her stock at a price of $3.15 per share.

## B. Zynga's Capital Structure

Zynga has three classes of common stock: (i) Class A shares, entitled to one vote per share; (ii) Class B shares, entitled to seven votes per share; and (iii) Class C shares, entitled to seventy votes per share, which "were issued only to Pincus."[3] Zynga's publicly traded stock is its Class A shares. Except for matters that affect Class B or Class

---

[3] *Id.* ¶ 29.

C shares differently, the three classes vote together on all matters submitted to Zynga stockholders, including the election of directors.

## C. Zynga's Directors and Most Pre-IPO Stockholders Agree to Lockup Restrictions in Advance of the Company's IPO

On December 16, 2011, Zynga completed its IPO. It sold 100 million shares to the public at $10 per share, raising $1 billion. The offering price implied an enterprise value for the company of over $7 billion.

Before the IPO, the Director Defendants, Zynga's officers and employees, and most other pre-IPO investors (including plaintiff Lee) had agreed to lockup restrictions that prevented them from selling their Zynga stock for a 165-day period after December 15, 2011, *i.e.*, until after May 28, 2012. Collectively, approximately 688 million shares[4]—nearly seven times the initial public float—were subject to these lockup restrictions. The company disclosed the terms of the lockup restrictions in a Form S-1/A filed with the Securities and Exchange Commission on December 15, 2011 (the "December S-1"). According to the "Risk Factors" section of the December S-1, making additional Class A shares available to the public could "depress" the company's stock price.[5]

---

[4] Rohrer Decl. Ex. 3 (Zynga Inc., Amendment No. 1 to Registration Statement (Form S-1/A), at 125 (Mar. 23, 2012)) (the "March S-1"). I may consider limited parts of the March S-1 at the motion to dismiss stage because it is referenced as the source for Lee's allegations in Paragraphs 43, 47, and 49 of the Amended Complaint and, therefore, is integral to Lee's claims. *See In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 69-70 (Del. 1995).

[5] The December S-1 stated, in relevant part:

Morgan Stanley and Goldman acted in the IPO as the lead underwriters and as the representatives for the other underwriters. In its IPO underwriting agreement with Morgan Stanley and Goldman, Zynga had agreed "[n]ot to amend, modify or terminate, or waive any provision of, any of the 'lock-up' agreements with [its] officers, directors or stockholders" without the underwriters' prior written consent.[6]

### D. With the Consent of Morgan Stanley and Goldman, Zynga's Board Restructures the Lockup Restrictions

In March 2012, Zynga's directors decided to modify the lockup restrictions to permit certain pre-IPO stockholders to sell some of their shares before the original May 28, 2012, expiration date and the rest of their shares after the original May 28, 2012, expiration date. I infer from the Amended Complaint that all eight of Zynga's directors voted in favor of this lockup restructuring.[7] As reflected in a Form S-1/A filed with the SEC on March 23, 2012 (the "March S-1"), the board received the consent of Morgan

---

Future sales of our Class A common stock in the public market could cause our share price to decline. Sales of a substantial number of shares of our Class A common stock in the public market after this offering, or the perception that these sales might occur, could depress the market price of our Class A common stock and could impair our ability to raise capital through the sale of additional equity securities.

Am. Compl. ¶ 37; *see also id.* ¶ 38.

[6] *Id.* ¶ 36 (quoting December S-1).

[7] *See id.* ¶ 47 ("Pincus, Schappert, Hoffman, Van Natta, and the other selling shareholders were the beneficiaries of a selective waiver of the [l]ockups by the Board and the Underwriter Defendants."), ¶ 53 ("[T]he [s]econdary [o]ffering was possible only because the Board and the Underwriter Defendants approved it.").

6

Stanley and Goldman to restructure the lockups. The restructuring created staggered lockup expiration dates falling into four categories.

First, Zynga's board waived the 165-day lockup restrictions for approximately 49 million shares (inclusive of the underwriters' option to purchase additional shares) held by select investors, including four of Zynga's eight directors: Pincus, Schappert, Hoffman, and Van Natta. For the stock held by these four directors, the board also waived the company's "blackout" policy, which prohibited Zynga employees from selling stock during a designated period around the company's quarterly earnings releases. These waivers were made to facilitate a secondary offering of Zynga stock to the public that closed on April 3, 2012. Director Defendants Pincus, Schappert, Hoffman, and Van Natta would each participate in this secondary offering.

Second, the board waived the 165-day lockup restrictions for approximately 114 million shares held by non-executive employees.[8] Although these shares were no longer subject to the lockups, they remained subject to the company's blackout policy. By operation of the blackout policy, these non-executive employees were first able to sell their approximately 114 million shares on May 1, 2012.

Third, for approximately 325 million shares held by former employees (including plaintiff Lee) and certain institutional investors, the lockups were not modified. Those shares could be sold starting on May 29, 2012, after the 165-day lockup period expired.

---

[8] The Amended Complaint alleges that 114 million shares fall into this category, but the March S-1 refers to 115 million shares. *Compare* Am. Compl. ¶ 49, *with* March S-1 at 125. The difference is immaterial to this decision.

Fourth, the board extended the lockup restrictions for the remaining holdings of those stockholders who were permitted to participate in the secondary offering and certain other stockholders. This last group included the rest of the stock held by all eight Zynga directors. In total, approximately 200 million shares were subject to extended lockups. Approximately 50 million shares could be sold on July 6, 2012, and approximately 150 million shares could be sold on August 16, 2012.[9]

### E.    The Secondary Offering

On April 3, 2012, the secondary offering closed at a price of $12.00 per share. Pincus sold 16.5 million shares and received net proceeds of $192,060,000, representing nearly 40% of the total proceeds from the offering. Each of Schappert, Hoffman, and Van Natta sold several million dollars' worth of their Zynga stock in the secondary offering. Schappert sold 322,350 shares for net proceeds of $3,752,154. Hoffman sold 687,626 shares for net proceeds of $8,003,967. Van Natta sold 505,267 shares for net proceeds of $5,881,308. Zynga did not sell any shares in the secondary offering.

As they had in the IPO, Morgan Stanley and Goldman acted as the lead underwriters (and as the representatives for the other underwriters) for the secondary offering. For their services, Morgan Stanley and Goldman each received more than $5.3 million in fees and commissions.

---

[9] March S-1 at 125.

**F.     The Decrease in Zynga's Stock Price after the Secondary Offering**

After the secondary offering in 2012, Zynga's stock "began a precipitous decline" in value.[10] Most relevant here are the market prices when the company's pre-IPO investors, now subject to a range of lockup restrictions, could first sell their stock. Zynga's stock fell from the secondary offering price of $12.00 per share on April 3, 2012, to a closing price of $8.46 per share on May 1 (when approximately 114 million shares could be sold by current, non-executive employees), and then to a closing price of $6.09 per share on May 29 (when approximately 325 million shares could be sold by Lee, other former employees, and institutional investors). In their brief, the Zynga Defendants note that the company's stock price continued to decline after May 29, to a closing price of $5.36 per share on July 6 (when approximately 50 million shares could be sold by Zynga directors and other investors), and then to a closing price of $3.00 per share on August 16 (when approximately 150 million shares could be sold by Zynga directors and other investors).[11]

Based on Lee's calculations, had the four Zynga directors who sold stock in the secondary offering at $12.00 per share instead sold those shares on May 29 at $6.09 per

---

[10] Am. Compl. ¶ 60.

[11] Zynga Defs.' Op. Br. 6. The Amended Complaint included a graph reflecting the price of Zynga stock from approximately December 15, 2011, to approximately June 28, 2012. *Id.* Lee failed to include, however, the specific per-share closing price on any relevant date. The Zynga stock prices listed above are from Yahoo! Finance. *See* http://finance.yahoo.com/q/hp?s=ZNGA+Historical+Prices. I take judicial notice of these reported stock prices because they are not subject to reasonable dispute. *See* D.R.E. 201(b)(2); *see also In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 169 (Del. 2006).

9

share, they would have received approximately $100 million less in proceeds. This calculation is the basis of Lee's allegation that the lockup waivers received by the four Zynga directors were "worth" approximately $100 million.[12]

### G. Procedural Background[13]

On April 4, 2013, Lee commenced this action against defendants. On May 10, 2013, defendants filed a notice of removal from the Court of Chancery to the United States District Court for the District of Delaware. On December 23, 2013, the District Court granted Lee's motion for remand to this Court for lack of federal jurisdiction.[14]

On January 17, 2014, Lee filed the Amended Complaint, asserting two causes of action. Count I asserts that the Director Defendants breached their fiduciary duty of loyalty by waiving the lockup restrictions to favor the Director Defendants at the expense of other pre-IPO stockholders. Count II asserts that the Underwriter Defendants aided and abetted those breaches of fiduciary duty.

On March 6, 2014, the Zynga Defendants moved to dismiss Count I of the Amended Complaint under Court of Chancery Rules 12(b)(6) and 23.1. Also on March

---

[12] Am. Compl. ¶ 62.

[13] In addition to this action, there are derivative lawsuits filed against certain of the Director Defendants in California state court and in the United States District Court for the Northern District of California. McGeever Trans. Aff. Ex. 1-5. There also is a derivative lawsuit pending against the Director Defendants in this Court that is currently stayed by agreement of the parties. Stip. and Order, *Sandys v. Pincus*, C.A. No. 9512-CB (Del. Ch. Oct. 21, 2014).

[14] *See Lee v. Pincus*, 2013 WL 6804640, at *2 (D. Del. Dec. 23, 2013).

10

6, 2014, the Underwriter Defendants moved to dismiss Count II of the Amended Complaint under Court of Chancery Rule 12(b)(6).[15]

## III. LEGAL ANALYSIS

In Count I, Lee alleges that the Director Defendants breached their fiduciary duties by "selectively releasing the [l]ockups, selectively waiving the [b]lackout [p]olicy, and authorizing the [s]econdary [o]ffering to benefit themselves."[16] She further alleges that the secondary offering, made possible only by the lockup waivers, "was approved by a self-interested board of directors, acting to serve the interests of its own members and the [c]ompany's controlling shareholder [(*i.e.*, Pincus)]."[17] With respect to the shares held by the Director Defendants who participated in the secondary offering, I focus my attention here on the waiver of the lockups as shorthand for the alleged waiver of both the lockups and the company's blackout policy.

The Zynga Defendants raise three arguments in support of their motion to dismiss Count I. First, they contend that the cause of action is derivative and that Lee failed to satisfy the pleading requirements of Court of Chancery Rule 23.1. Second, they assert that Lee's claim sounds in contract law and thus does not state a claim for breach of

---

[15] Defendants also moved to stay discovery in this action pending resolution of their motions to dismiss. At oral argument on August 22, 2014, I granted this motion except that I required the production to plaintiff of documents Zynga previously had produced to a stockholder in a separate action initiated in this Court pursuant to 8 *Del. C.* § 220. *See* Stip. and Final Order, *Sandys v. Zynga Inc.*, C.A. No. 8450-ML (Del. Ch. Sept. 19, 2013).

[16] Am. Compl. ¶ 74.

[17] *Id.* ¶ 73; *see also id.* ¶¶ 52, 63-64.

fiduciary duty. Third, they argue that, even if fiduciary duty principles govern the claim, it must be dismissed because Lee has failed to rebut the business judgment rule. These issues are considered, in turn, below.

### A. Count I Alleges Direct Harm to Lee

Lee seeks to bring this action on behalf of a class consisting of all Zynga stockholders, excluding defendants and their affiliates, who "were subject to the [l]ockups, and who were not permitted to sell shares in the [s]econdary [o]ffering."[18] Thus, the putative class would be limited to a subgroup of Zynga's pre-IPO stockholders and would exclude all of the company's public stockholders, who were not subject to the lockup restrictions.

Despite how Count I is pled, the Zynga Defendants argue that the claim is derivative in nature on the theory that it is based on a "devaluation in stock resulting from [their] alleged breach of fiduciary duty."[19] According to the Zynga Defendants, a devaluation in stock price would affect all Zynga stockholders proportionally and would not affect Lee and the putative class individually.

In opposition, Lee asserts that Count I does not fit within the framework of a traditional derivative claim. For example, she does not contend that the Director Defendants breached their fiduciary duties by selling stock in the secondary offering

---

[18] *Id.* ¶ 65.

[19] Zynga Defs.' Op. Br. 14.

12

based on confidential information, which would give rise to derivative harm.[20] Nor does she contend that the Director Defendants usurped a corporate opportunity[21] or wasted corporate assets,[22] both of which likewise would harm Zynga stockholders derivatively. Rather, Lee contends that Count I asserts a direct claim because the harm "relates to the transferability of [her] shares, not any injury, direct or indirect, to Zynga itself."[23] Specifically, she submits that "the injury flows from being deprived of the same opportunity to sell as the Director Defendants provided to themselves."[24]

The Delaware Supreme Court articulated the test for determining whether a stockholder plaintiff's claim is direct or derivative in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*[25] The analysis turns "solely" on two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?"[26] The *Tooley* test is not necessarily a binary inquiry, as certain corporate

---

[20] *See, e.g.*, *Kahn v. Kolberg Kravis Roberts & Co., L.P.*, 23 A.3d 831, 836-38 (Del. 2011).

[21] *See, e.g.*, *Thorpe v. CERBCO, Inc.*, 676 A.2d 436, 442 (Del. 1996).

[22] *See, e.g.*, *Kramer v. W. Pac. Indus., Inc.*, 546 A.2d 348, 353 (Del. 1988).

[23] Pl.'s Ans. Br. 17.

[24] *Id.* 18.

[25] 845 A.2d 1031 (Del. 2004).

[26] *Id.* at 1033.

13

wrongs are said to harm stockholders directly and derivatively.[27] Essential to asserting a direct claim are allegations of "some individualized harm not suffered by all of the stockholders at large."[28]

The parties have not cited any Delaware case squarely addressing whether the claim advanced as Count I may be asserted directly.[29] In my opinion, Count I asserts a direct claim under *Tooley* because the Director Defendants' decision to restructure the lockups gave allegedly "preferential treatment"[30] to certain pre-IPO stockholders over others. Specifically, the modification of the lockups allegedly benefitted the liquidity of the stock of the Director Defendants that could be sold in the secondary offering relative to the stock held by Lee and the putative class.[31] Moreover, the whole universe of Zynga's public stockholders—who were not subject to the lockups to begin with—were unaffected by any of the Director Defendants' actions, even though they were Zynga

---

[27] *See, e.g.*, *Gentile v. Rossette*, 906 A.2d 91, 99-100 (Del. 2006).

[28] *Feldman v. Cutaia*, 951 A.2d 727, 733 (Del. 2008).

[29] The closest analogue cited by the parties is *Nixon v. Blackwell*, 626 A.2d 1366 (Del. 1993). In *Nixon*, plaintiffs alleged that the director defendants, as Class A stockholders, received benefits by way of an employee stock ownership plan and various "key man" life insurance policies, which were not shared with the plaintiffs, Class B stockholders. *Id.* at 1375-79. The Delaware Supreme Court considered whether it was entirely fair for the corporation's directors to not offer the same liquidity to Class B stockholders as to Class A stockholders. Neither the Supreme Court nor the trial court, however, expressly addressed whether the plaintiffs' claim was direct or derivative.

[30] Am. Compl. ¶¶ 49, 73.

[31] Although the Amended Complaint does not expressly identify "liquidity" as the harm, Tr. of Oral Arg. 12-13, it is reasonable to infer that the alleged harm of "preferential treatment" (to the stockholders who received lockup waivers) embodies the concept of liquidity.

14

stockholders when the lockups were waived. In short, the alleged harm is unique to Lee and the putative class of pre-IPO stockholders who were not permitted to participate in the secondary offering.

The Zynga Defendants' primary authority in support of their position, *Feldman v. Cutaia*,[32] does not change my conclusion. *Feldman* involved breach of fiduciary duty claims relating to the directors' decision to issue stock options for allegedly inadequate consideration. The Delaware Supreme Court concluded that the plaintiff's purportedly direct claim challenging the board's failure to consider the validity of the options when approving a merger agreement (resulting in less merger consideration to the plaintiff) was derivative under *Tooley* because the alleged harm was "exactly the same" as the harm to the corporation alleged in another of the plaintiff's claims challenging the validity of the options when they were issued: dilution in value of the corporation's stock, a classic derivative harm.[33]

Unlike the plaintiff in *Feldman*, Lee alleges no harm to the corporation or to all stockholders because the lockup waivers did not harm Zynga or the liquidity of all Zynga stockholders but only that of the putative class of pre-IPO stockholders. Lee is thus not "restating a derivative claim under the guise of a direct claim."[34] Because I find Count I

---

[32] 951 A.2d 727 (Del. 2008).

[33] *See id.* at 732-33.

[34] *Protas v. Cavanagh*, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012).

to state a direct claim, Lee does not need to satisfy the pleading requirements of Rule 23.1, and the Zynga Defendants' motion to dismiss Count I under Rule 23.1 is denied.[35]

## B. Count I Asserts a Claim Governed by Fiduciary Duty Principles

The Zynga Defendants assert that their obligations to Lee and the putative class with respect to the lockup restrictions are limited exclusively to those set forth in the agreements providing for the lockups. That is, they disclaim that the Director Defendants owed any fiduciary duties to the pre-IPO stockholders regarding any modification to any contractual lockup restrictions, including to their own lockups. They argue that Lee was not harmed by the lockup restructuring because she "received exactly what she was

---

[35] In the Amended Complaint, Lee requests disgorgement of the amounts by which the Director Defendants were unjustly enriched. Am. Compl. Prayer for Relief ¶ B. The Zynga Defendants argue that the request for disgorgement, which is typically associated with derivative claims, demonstrates that Count I asserts derivative harm. Zynga Defs.' Op. Br. 15-16. This argument overlooks the fact that Lee also seeks to have the Director Defendants account to her and the putative class "for all damages suffered." Am. Compl. Prayer for Relief ¶ B. At this procedural stage, this request for damages is sufficient to support a direct claim because it has a "logical or reasonable relationship to the harm." *See In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 773 (Del. 2006). Although it is not apparent to me how disgorgement would be a proper remedy in this case, resolution of that issue is for another day.

Separately, the Zynga Defendants complain that Lee should not be permitted to "win a race to judgment and capture the disgorgement remedy for herself" ahead of the derivative actions filed in California and in this Court that seek disgorgement from certain Director Defendants. Zynga Defs.' Reply Br. 23-24. Underlying this contention is the general principle, which Lee acknowledges, Pl.'s Ans. Br. 22, that a given dollar can be disgorged only once. *See, e.g., Litton Indus., Inc. v. Lehman Bros. Kuhn Loeb Inc.*, 734 F. Supp. 1071, 1076 (S.D.N.Y. 1990). This concern of the Zynga Defendants is not a basis in my view for dismissing Count I, which otherwise states a claim for breach of fiduciary duty. Rather, this concern speaks to the appropriate remedy to be awarded if liability is established on the theory plaintiff has espoused, and bears on the question whether prosecution of this case should be coordinated somehow with the other actions going forward.

16

entitled to under her contract—she was permitted to sell her Zynga stock without restriction beginning on May 29, 2012."[36]

Lee insists that her claim is governed by fiduciary duty principles, not by contract law, because her Exercise Agreement did not "expressly address" the possibility that the Director Defendants could modify the lockups covering the stock they owned to the detriment of Lee and other members of the class.[37] Alternatively, she asserts that any contractual provision to that effect would be an unenforceable waiver of the duty of loyalty by the Director Defendants.[38]

---

[36] Zynga Defs.' Op. Br. 18.

[37] Section 7 of the Exercise Agreement contains the lockup restriction governing Lee's shares. It states as follows:

> 7.    Market Standoff Agreement. Purchaser agrees in connection with any registration of the Company's securities that, upon the request of the Company or the underwriters managing any public offering of the Company's securities, Purchaser will not sell or otherwise dispose of any Shares without the prior written consent of the Company or such underwriters, as the case may be, for such period of time (not to exceed 180 days) after the effective date of such registration requested by such managing underwriters and subject to all restrictions as the Company or the underwriters may specify. Purchaser further agrees to enter into any agreement reasonably required by the underwriters to implement the foregoing.

Rohrer Decl. Ex. 1, § 7. The Exercise Agreement was not attached to the Amended Complaint, but it is plainly integral to Lee's claims. Thus, I may consider it at this procedural stage. *See Santa Fe*, 669 A.2d at 69-70.

[38] Pl.'s Ans. Br. 24-33.

17

Directors of Delaware corporations owe fiduciary duties to the corporation and to the stockholders.[39] In certain circumstances, these fiduciary duties may be preempted by contractual obligations set forth in a contract between the corporation and its stockholders, as the Delaware Supreme Court held in *Nemec v. Shrader*.[40]

In *Nemec*, former stockholders alleged that the directors unfairly caused the corporation to redeem their stock pursuant to the plan by which they received their shares. The Supreme Court concluded that the stockholders' breach of fiduciary duty claim was "foreclosed as superfluous" because the "dispute relat[ed] to the exercise of a *contractual* right."[41] In other words, the Supreme Court held that because the dispute was over the exercise of a contractual right governing the shares at issue, any claim by the former stockholders against the directors with respect to the redemption rights would sound in contract law, not in fiduciary duty principles. Under *Nemec*, a contract must "expressly" address an issue, and thereby create a right that is "solely a creature of contract," for the contract to preempt the default fiduciary relationship between directors and stockholders.[42]

---

[39] *See Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989).

[40] 991 A.2d 1120 (Del. 2010).

[41] *Id.* at 1129.

[42] *See id.*; *see also Blaustein v. Lord Baltimore Capital Corp.*, 2013 WL 1810956, at *11-13 (Del. Ch. Apr. 30, 2013) (concluding, in a closely-held corporation, that a breach of fiduciary duty claim with respect to the board's rejection of the stockholder plaintiffs' stock repurchase proposal, as well as their proposal to form an independent committee to consider the repurchase proposal, were foreclosed by a shareholders' agreement that

This Court has identified a similar principle in several recent decisions analyzing in what contexts, and to what extent, the fiduciary duties owed by directors to preferred stockholders may be preempted by the contractual rights set forth in the preferred stock's certificate of designation. For example, in *LC Capital Master Fund, Ltd. v. James*,[43] the preferred stockholder plaintiffs claimed that the directors breached their fiduciary duties by not allocating additional merger consideration to the preferred beyond the "as if converted" value set forth in the certificate of designation. Then-Vice Chancellor Strine rejected this argument, concluding that "[w]hen, by contract, the rights of the preferred in a particular transactional context are articulated" in the corporation's charter, the board must satisfy those rights but "need not go further and extend some fiduciary beneficence on the preferred at the expense of the common."[44] Thus, under Delaware law, "[p]referred stockholders are owed fiduciary duties only when they do not invoke their special contractual rights and rely on a right shared equally with the common stock."[45] Underlying these decisions is the policy that, "in matters involving the essentially contractual rights and obligations of preferred stockholders," the contractual obligations

---

expressly "provides an explicit process by which the parties intended for share repurchases to occur"), *aff'd*, 84 A.3d 954 (Del. 2014).

[43] 990 A.2d 435 (Del. Ch. 2010).

[44] *Id.* at 449-50.

[45] *In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 39-40 (Del. Ch. 2013).

supplant any fiduciary obligations.[46]  A related principle also appears in the partnership and limited liability company contexts.[47]

The Zynga Defendants argue that the principle animating *Nemec* and *LC Capital* applies with equal force here.  In particular, they contend that, in the same way that the conversion ratios in the certificate of designation defined the board's obligations to preferred stockholders with respect to the merger consideration in *LC Capital*, the lockup provision in the Exercise Agreement exclusively defined their obligations to Lee with respect to the lockup restrictions.  That is, the Zynga Defendants maintain that they "did not owe [Lee] (or her proposed class) a fiduciary duty to provide her with different terms from those contained in her contract."[48]  Thus, from their perspective, Lee inappropriately "asks this Court to rewrite the [Exercise Agreement] and insert a provision that would divest the corporation of its discretion regarding whether or how to waive the lockup restriction."[49]

I disagree.  The core issue in this case is whether the existence of the Exercise Agreement, and the company's rights under that agreement, superseded the Director Defendants' general fiduciary obligations to Lee as a Zynga stockholder.  In my view, the

---

[46] *See Gale v. Bershad*, 1998 WL 118022, at *5 (Del. Ch. Mar. 4, 1998).

[47] *See, e.g.*, *AM Gen. Hldgs. LLC v. Renco Gp., Inc.*, 2013 WL 5863010, at *10 (Del. Ch. Oct. 31, 2013) (limited liability company agreement); *Grunstein v. Silva*, 2009 WL 4698541, at *6 (Del. Ch. Dec. 8, 2009) (oral partnership); *Schuss v. Penfield P'rs, L.P.*, 2008 WL 2433842, at *10 (Del. Ch. June 13, 2008) (limited partnership agreement).

[48] Zynga Defs.' Op. Br. 18.

[49] *Id.*

fact that the putative class members' shares were governed by contracts containing lockup restrictions does not eliminate the fiduciary duties of the Director Defendants to act loyally to all Zynga stockholders—especially when the challenged action did not involve the exercise of any contractual right governing Lee's shares but instead involved modifications to the contractual provisions governing their own shares.

This case is thus distinguishable from *Nemec* and *LC Capital.* Unlike in *Nemec*, where the company exercised a redemption right governing the shares at issue, this case does not involve any action that was taken under the terms of the contracts governing the putative class members' shares.[50] Unlike in *LC Capital*, this case does not turn on whether Lee or other members of the putative class are entitled to additional rights or benefits than were afforded to them under the contracts they signed containing the lockup restrictions.

The Zynga Defendants' contention that "the staggered release had *no effect* on the liquidity or transferability of [Lee's] shares"[51] ignores key allegations of the Amended Complaint. The obligation Lee seeks to enforce is for the Director Defendants to not receive personal benefits inconsistent with the standard of conduct of fiduciaries under Delaware law.[52] She alleges that the Director Defendants gave themselves an improper

---

[50] The Exercise Agreement does not contain a provision expressly granting the Zynga board the discretion to waive or restructure their own lockup restrictions in a manner that might give them a benefit that is not shared pro rata with Lee. *See supra* note 37.

[51] Zynga Defs.' Reply Br. 21.

[52] *See, e.g.*, *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del. 1939) ("Corporate officers and directors are not permitted to use their position of trust and confidence to further their

21

benefit inconsistent with their duty of loyalty to Lee and the putative class.[53]  In my view, this is quintessentially a fiduciary duty claim.

## C. Count I States a Claim for Breach of Fiduciary Duty

A motion to dismiss under Rule 12(b)(6) for failure to state a claim for relief must be denied unless, assuming the well-pled allegations to be true and viewing all reasonable inferences from those allegations in the plaintiff's favor, there is no "reasonably conceivable set of circumstances susceptible of proof" in which the plaintiff could recover.[54]  Although "conclusory allegations that are unsupported by specific facts" are not accepted as true, and "unreasonable inferences [are not drawn] in the plaintiff's favor,"[55] the pleadings required to satisfy the reasonable conceivability standard are "minimal."[56]  "[I]t may, as a factual matter, ultimately prove impossible for the plaintiff to prove his claims at a later stage of a proceeding, but that is not the test to survive a motion to dismiss."[57]

When a stockholder plaintiff claims that the directors breached their fiduciary duties, Delaware courts review the alleged misconduct through a doctrinal standard of

private interests. . . . The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest.").

[53] *See, e.g.*, Am. Compl. ¶ 63.

[54] *See Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 536 (Del. 2011).

[55] *Allen v. Encore Energy P'rs, L.P.*, 72 A.3d 93, 100 (Del. 2013).

[56] *Cent. Mortg.*, 27 A.3d at 536.

[57] *Id.*

review.[58] The default standard of review is that of business judgment, which presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company."[59] This presumption attaches to business decisions where disinterested and independent directors constitute a majority of those who vote in favor of the challenged transaction.[60]

A plaintiff may rebut the business judgment standard by alleging that at least half of the directors who approved the decision at issue are not entitled to its protection.[61] For example, a plaintiff may state a claim for breach of the duty of loyalty by alleging that half of the directors who approved the decision were not disinterested, were not independent, or did not act in good faith.[62] In that case, the entire fairness standard of review is implicated, which requires the defendants to establish that the decision "was the product of both fair dealing *and* fair price."[63]

Lee's main theory for rebutting the business judgment standard of review is that four of the eight Zynga directors had a personal financial interest in the lockup

---

[58] *See Trados*, 73 A.3d at 35.

[59] *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984).

[60] *See id.* at 813-14.

[61] *See In re KKR Fin. Hldgs. LLC S'holder Litig.*, -- A.3d --, 2014 WL 5151285, at *6 (Del. Ch. Oct. 14, 2014); *see also In re Ebix, Inc. S'holder Litig.*, 2014 WL 3696655, at *28 (Del. Ch. July 24, 2014).

[62] *See, e.g.*, *Brehm v. Eisner*, 746 A.2d 244, 264 n.66 (Del. 2000).

[63] *Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1156, 1163 (Del. 1995).

restructuring because they received a benefit not shared with all pre-IPO stockholders: the opportunity to participate in the secondary offering.[64] Broadly characterized, the Zynga Defendants' position is that no director received a benefit in the lockup restructuring primarily for two reasons: (i) the four directors who sold in the secondary offering agreed to subject a greater percentage of their stock to extended lockups (80%) than the percentage that they could sell in the secondary offering (20%);[65] and (ii) the average market price at which those four directors could first sell their pre-IPO shares in the secondary offering and after the expired lockups expired ($5.27 per share) was less than the market price at which those subject to unmodified lockups could first sell their pre-IPO shares ($6.09 per share).[66]

---

[64] Lee also seeks to rebut the business judgment standard on the theory that (i) half of the Zynga directors who approved the restructuring "lacked independence under NASDAQ's listing requirements and rules" or (ii) Pincus, who held 36.5% of Zynga's voting power immediately before the secondary offering, was the company's controlling stockholder. Am. Compl. ¶¶ 33-34. Based on my analysis of Lee's primary theory, I need not consider these alternative grounds.

[65] Zynga Defs.' Op. Br. 21-22. The Zynga Defendants submit that the pre-IPO investors who received the lockup waivers were only able to sell approximately 20% of their holdings in the secondary offering on April 3, 2012, and that those stockholders also agreed to subject approximately 20% of their remaining holdings to lockup restrictions until July 6, 2012, and the other approximately 60% of their holdings to restrictions until August 16, 2012. The Amended Complaint is silent concerning how many, if any, shares held by Pincus, Schappert, Hoffman, and Van Natta (i) were subject to extended lockups and (ii) were actually sold on or after July 6, 2012. Despite the lack of any such factual allegations, the Zynga Defendants argue that there was no benefit to those four directors because their "relative liquidity" was worse off on the whole. Tr. of Oral Arg. 26.

[66] Zynga Defs.' Op. Br. 21-22. The secondary offering price was $12.00 per share, the closing price on July 6 was $5.36 per share, and the closing price on August 16 was $3.00 per share. The Zynga Defendants calculate that a stockholder subject to the unmodified lockups could sell at $6.09 per share on May 29, 2012, but the four directors with the

As support for their arguments, the Zynga Defendants cite *In re Paxson Communication Corp. Shareholders Litigation*[67] and *Robotti & Co., LLC v. Liddell*[68] for the proposition that this Court cannot find a Zynga director interested unless "the benefits of the changes to the selling stockholders' lockup agreements outweighed the significant burdens that were also part of the transaction."[69] I agree with the general proposition that it is appropriate to consider the effect of the entire transaction on a director when determining whether a particular director is interested for standard of review purposes. But, in applying that principle here, I cannot conclude that it is not reasonably conceivable that half of the Director Defendants had a personal financial interest in the lockup restructuring or that they received an unfair benefit as a result of that transaction.

A director may be interested in a transaction if, as a result of the business decision at issue, the director receives a "personal financial benefit . . . as opposed to a benefit which devolves upon the corporation or all stockholders generally."[70] The Amended Complaint cites empirical studies for the proposition that, after the lockup period expires for stock held by pre-IPO investors in a newly public company, the market price of the

---

waived and extended lockups could sell at an average of only $5.27 per share. Based on this difference, they claim there was no net benefit.

[67] 2001 WL 812028 (Del. Ch. July 12, 2001).

[68] 2010 WL 157474 (Del. Ch. Jan. 14, 2010).

[69] Zynga Defs.' Op. Br. 22.

[70] *Aronson*, 473 A.2d at 812.

25

company's stock typically decreases by 1.5% to 2%.[71]  The Zynga Defendants also contemporaneously recognized this issue in the "Risk Factors" section of the December S-1, albeit tacitly, by disclosing that making additional Class A shares available to the public could depress the company's stock price.

Before the lockup restructuring, the Director Defendants and the putative class of Zynga stockholders were similarly situated: all of their lockups were to expire on May 28, 2012.  Through the restructuring, four of the Director Defendants received lockup waivers allowing them to sell earlier than May 28; the putative class did not.  Affording plaintiff all reasonable inferences, as I must at this procedural stage, it is reasonably conceivable that, as of the time when the decision was made to restructure the lockups,[72] the opportunity to sell earlier—before the market price could be expected to decrease

---

[71] Am. Compl. ¶¶ 39-40; *see also* Alon Brav & Paul A. Gompers, *The Role of Lockups in Initial Public Offerings*, 16 Rev. Fin. Stud. 1-29 (2003) (finding an average decrease of approximately 1.5% for a sample size of 2,794 recently public companies during a period from 1988-1996); Daniel Bradley et al., *Venture Capital and IPO Lockup Expiration: An Empirical Analysis*, 24 J. Fin. Res. 465-93 (2001) (finding an average decrease of approximately 2% for a sample size of 2,529 recently public companies during a period from 1988-1997); Laura Casares Field & Gordon Hanka, *The Expiration of IPO Share Lockups*, 56 J. Fin. 471-500 (2001) (finding an average decrease of approximately 1.5%-2% for a sample size of 1,948 recently public companies during a period from 1988-1997).

[72] The Zynga Defendants acknowledge that the "'[t]he correct time for measuring the Director Defendants' decisionmaking is at the time the waiver decision was made,' not with hindsight."  Zynga Defs.' Reply Br. 9 (citing *In re Compellent Techs., Inc. S'holder Litig.*, 2011 WL 6382523, at *20 (Del. Ch. Dec. 9, 2011)).

26

according to the empirical studies cited in the Amended Complaint—afforded those directors a benefit that outweighed any detriment from the lockup extensions.[73]

Despite their arguments to the contrary, the Zynga Defendants have not demonstrated why it is unreasonable to infer at this stage that the overall lockup restructuring may have conferred a benefit to the directors. The calculations the Zynga Defendants have offered comparing the average market prices at which the Director Defendants and Lee could sell their pre-IPO stock appear to suffer from at least two infirmities. First, these calculations are entirely hypothetical. No record exists concerning any actual sales the Zynga directors made after the extended lockups expired.[74] Second, the market prices for Zynga stock embedded in these calculations are *ex post*, making them inconsistent with the principle of Delaware law that the decisions of directors should be reviewed in the context of when those decisions were made.[75] It may well be that, when a record is developed, the Zynga Defendants will demonstrate that the directors who participated in the secondary offering did not receive a net benefit

---

[73] Discovery could reveal, for example, that the directors who participated in the secondary offering intended when they approved the lockup restructuring only to sell shares in the near term in the secondary offering. At the other end of the spectrum, the record could show that they then intended to sell all of their shares as soon as the lockups applicable to each tranche expired.

[74] Going outside her pleading, plaintiff asserts that "none of the directors who were subject to the modified lockup agreements sold any further Zynga shares in 2012 after the Secondary Offering, despite the fact that they were free to do so under their modified lockup agreements in early July 2012." Pl.'s Ans. Br. 14.

[75] *See, e.g.*, *In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 830 (Del. Ch. 2011).

27

in connection with the restructuring of the lockup restrictions. At this stage of the case, however, the opposite conclusion is reasonably conceivable in my view, which is all that is necessary for plaintiff to survive a motion to dismiss under Rule 12(b)(6).

Unlike here, the Court in *Robotti*, the primary decision on which the Zynga Defendants rely, was able to conclude definitively at the pleadings stage that the challenged transaction did not confer a benefit upon the directors. In *Robotti*, the plaintiff alleged that the directors breached their fiduciary duties because a stockholder rights offering unfairly adjusted the conversion ratio of the directors' stock options pursuant to the anti-dilution provisions of those options. The Court rejected the plaintiff's argument that the additional stock to be issued when the directors exercised their adjusted options "would be issued for free" because the plaintiff "failed to account for the exercise price of the options."[76] By operation of the anti-dilution provisions, the directors had options to acquire the same equity percentage of the company at the same aggregate price both before and after the offering. In other words, the anti-dilution provisions merely preserved the directors' preexisting contractual rights. Thus, the Court in *Robotti* concluded that the plaintiff was "unable, from its well-pled factual allegations, to support the inference that the Defendants received a personal benefit from the Offering."[77]

As discussed above, the facts here do not warrant the same conclusion. The lockup waivers the Zynga directors received were not granted by operation of some pre-

---

[76] *Robotti*, 2010 WL 157474, at *8.

[77] *Id.* at *10.

existing contractual rights, and it is not self-evident that the directors received no net benefit from their being able to participate in the secondary offering while extending the lockups on their remaining shares.

Finally, the Zynga Defendants argue that the lockup waivers were not a "material" benefit, which they contend is necessary to render a director interested for standard of review purposes.[78] The Court recently addressed this question in *Cambridge Retirement System v. Bosnjak*,[79] a case involving allegations of excessive director compensation. There, relying on the Delaware Supreme Court's decision in *Cede & Co. v. Technicolor, Inc.*[80] and other authority,[81] the Court concluded that, where a director allegedly engages in self-dealing, that director is "interested" by virtue of receiving a benefit in the transaction, regardless of whether that benefit was material to him or her.[82]

Here, the Zynga board at the time of the lockup restructuring consisted of eight directors, and it is reasonably conceivable for the reasons explained above that four of them received a benefit in the lockup restructuring. Under the familiar definition of self-

---

[78] Zynga Defs.' Reply Br. 6; Zynga Defs.' Op. Br. 23.

[79] 2014 WL 2930869 (Del. Ch. June 26, 2014).

[80] 634 A.2d 345, 362-63 (Del. 1993).

[81] *See, e.g.*, *Orman v. Cullman*, 794 A.2d 5, 23, 25 n.50 (Del. Ch. 2002); *HMG/Courtland Props., Inc. v. Gray*, 749 A.2d 94, 112-14 (Del. Ch. 1999); *Steiner v. Meyerson*, 1995 WL 441999, at *11 (Del. Ch. July 19, 1995).

[82] *Bosnjak*, 2014 WL 2930869, at *4-6.

dealing as a transaction in which a fiduciary stands "on both sides,"[83] the Director Defendants engaged in a self-dealing transaction.[84] Thus, under the analysis outlined in *Bosnjak*, those four Zynga directors are interested for standard of review purposes, even if the benefit they received from the lockup restructuring was not material to them individually. The Zynga Defendants' contrary authority is inapposite because it did not involve allegations of self-dealing.[85]

For the reasons stated above, Lee has pled facts sufficient to rebut the business judgment standard of review because the lockup restructuring was not approved by a majority of disinterested and independent directors. Further, it is reasonably conceivable that the benefit the Director Defendants received in the lockup restructuring was not entirely fair. Accordingly, the Zynga Defendants' motion to dismiss Count I for failure to state a claim for relief is denied.

---

[83] *Sinclair Oil Corp. v. Levien*, 280 A.2d 717, 720 (Del. 1971).

[84] *See Nixon*, 626 A.2d at 1375-76 (reviewing the board's decision under the entire fairness standard because the directors were "on both sides of the transaction" since they benefited from a stock plan and key man life insurance "beyond that which benefited other stockholders generally"); *see also eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 42 (Del. Ch. 2010) ("In transactions such as this, where fiduciaries deal directly with the corporation, entire fairness is ordinarily the applicable standard of review.").

[85] *See, e.g.*, *In re Gen. Motors Class H S'holders Litig.*, 734 A.2d 611, 617 (Del. Ch. 1999) ("To show that a GM director's *independence* was compromised . . . , the plaintiffs must show that . . . such holdings . . . was of a sufficiently material importance [to that director.]") (emphasis added).

**D.      Count II Does Not State a Claim for Aiding and Abetting**

In Count II, Lee alleges that the Underwriter Defendants aided and abetted the Director Defendants' breach of fiduciary duty.  Under Delaware law, a claim for aiding and abetting includes four elements: "(i) the existence of a fiduciary relationship, (ii) a breach of the fiduciary's duty, (iii) knowing participation in the breach by the non-fiduciary defendants, and (iv) damages proximately caused by the breach."[86]  Based on my conclusion that Count I states a claim for breach of fiduciary duty, Count II satisfies the first two elements.

To demonstrate the "knowing participation" element of an aiding and abetting claim, it must be reasonably conceivable from the well-pled allegations that "the third party act[ed] with the knowledge that the conduct advocated or assisted constitute[d] . . . a breach [of fiduciary duty]."[87]  Knowing participation has been described as a "stringent" standard that "turn[s] on proof of scienter."[88]  The alleged aider and abettor, not the fiduciary, must act with scienter.[89]  In *In re Telecommunications, Inc.*

---

[86] *In re Rural Metro Corp. S'holders Litig.*, 88 A.3d 54, 80 (Del. Ch. 2014) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).

[87] *Malpiede*, 780 A.2d at 1097.

[88] *Allied Capital Corp. v. GC-Sun Hldgs., L.P.*, 910 A.2d 1020, 1039 (Del. Ch. 2006).

[89] *See Houseman v. Sagerman*, 2014 WL 1600724, at *9 (Del. Ch. Apr. 16, 2014) (citing *Rural Metro*, 88 A.3d at 97).

*Shareholders Litigation*,[90] the Court provided an instructive summary of some of the ways in which a plaintiff successfully may plead knowing participation:

> [K]nowing participation may be inferred where the terms of the transaction are so egregious or the magnitude of side deals is so excessive as to be inherently wrongful. In addition, the Court may infer knowing participation if it appears that the defendant may have used knowledge of the breach to gain a bargaining advantage in the negotiations. The plaintiff's burden of pleading knowing participation may also be met through direct factual allegations supporting a theory that the defendant sought to induce the breach of fiduciary duty, such as through the offer of side payments intended as incentives for the fiduciaries to ignore their duties.[91]

Here, the Amended Complaint alleges that the Underwriter Defendants "profited" from the secondary offering, which was only possible after they "waiv[ed] the [l]ockups to which the participants in the [s]econdary [o]ffering were subject," through the "receipt of over $10.6 million in fees and commissions."[92] Lee further argues that the Underwriter Defendants "were fully aware of how the [s]econdary [o]ffering would operate to allow members of the [b]oard, senior management and the other selling stockholders to sell their shares while prohibiting Zynga's other employees and former employees from participating."[93]

---

[90] 2003 WL 21543427 (Del. Ch. July 7, 2003).

[91] *Id.* at *2 (citing, *inter alia*, *Crescent/Mach I P'rs, L.P. v. Turner*, 846 A.2d 963 (Del. Ch. 2000); *In re USACafes, L.P. Litig.*, 600 A.2d 43 (Del. Ch. 1991); *Zirn v. VLI Corp.*, 1989 WL 79963 (Del. Ch. July 17, 1989)).

[92] Am. Compl. ¶¶ 79, 81.

[93] Pl.' Ans. Br. 49-50.

In my opinion, the allegations of the Amended Complaint do not support a reasonable inference of knowing participation by the Underwriter Defendants. Critically, plaintiff has failed to plead any facts from which it is reasonably inferable that the Underwriter Defendants knew when they provided their consent to modify the lockup restrictions that such action would facilitate a breach of fiduciary duty by the Director Defendants. The fact that the Underwriter Defendants' consent was necessary for the Director Defendants to waive a lockup restriction, without more, is insufficient to demonstrate that the Underwriter Defendants gave their consent with the knowledge that the Director Defendants were treating Lee and the putative class unfairly.

The Amended Complaint, moreover, does not allege that the amount of fees the Underwriter Defendants received in connection with the secondary offering were unreasonable for the services performed.[94] Thus, there is no well-pled basis to infer that the Underwriter Defendants extracted unreasonable compensation or any form of improper "side deal" for consenting to the selective lockup waivers. In sum, it is not reasonable to infer here that, simply by receiving fees (that are not alleged to be unreasonable) for acting as underwriters in the secondary offering, the Underwriter Defendants "participated in the [Zynga] board's decisions, conspired with [the] board, or otherwise caused the board to make the decisions at issue."[95]

---

[94] *See* Tr. of Oral Arg. 58.

[95] *Malpiede*, 780 A.2d at 1098.

33

In support of her aiding and abetting claim, Lee relies primarily on Chancellor Chandler's decision in *In re eBay Inc. Shareholders Litigation.*[96] It is readily distinguishable. In *eBay*, the stockholder plaintiffs alleged that an investment bank engaged in "spinning" by actively providing lucrative investment opportunities in dozens of IPOs to the corporation's directors. The bank purportedly offered these opportunities in exchange for future business with the knowledge that the corporation had made similar equity investments in the past. Chancellor Chandler concluded that the plaintiffs had stated a claim for aiding and abetting because these allegations adequately supported the inference that the bank knowingly participated in the directors' usurpation of a corporate opportunity, in breach of their fiduciary duty of loyalty to the corporation.[97] Here, there is nothing alleged in the Amended Complaint about the conduct of the Underwriter Defendants that comes anywhere close to the magnitude of the allegations in *eBay*, which essentially amounted to allegations of bribery.

In sum, the allegations of knowing participation in the Amended Complaint are conclusory and fall short of those that Delaware courts routinely conclude do not substantiate a claim for aiding and abetting.[98] I therefore dismiss Count II for failure to state a claim for relief under Rule 12(b)(6).

---

[96] 2004 WL 253521 (Del. Ch. Jan. 23, 2004, revised, Feb. 11, 2004).

[97] *See id.* at *1, 5.

[98] The Underwriter Defendants also questioned whether the Amended Complaint includes any well-pled allegation of proximate causation with respect to their conduct. Given that Count II is deficient for failure to satisfy the knowing participation element of an aiding and abetting claim, I do not reach this issue.

## IV.  CONCLUSION

For the foregoing reasons, the Zynga Defendants' motion to dismiss Count I of the Amended Complaint under Court of Chancery Rule 23.1 and Rule 12(b)(6) is DENIED. The Underwriter Defendants' motion to dismiss Count II of the Amended Complaint under Court of Chancery Rule 12(b)(6) is GRANTED.

**IT IS SO ORDERED.**